UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

REED ENERGY, LLC and REED          :
ENERGY EXPLORATION, INC.,         :
                     :

     Plaintiffs,          :

                     :  Case No.: 1:13-cv-06656-AKH
                     :

     - against -        :  **MOTION FOR LEAVE TO AMEND THE COMPLAINT**
                     :

REGENT PRIVATE CAPITAL LLC,     :
REGENT PRIVATE CAPITAL II, LLC,  :
CHARLES STEPHENSON and      :
LAWRENCE FIELD,            :
                     :
                     :

     Defendants.        :

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS
MOTION TO AMEND THE COMPLAINT**

**WILSON HARVEY BROWNDORF LLP**
**Matthew C. Browndorf**
**Rudyard W. Ceres**
77 Water Street, 8th Floor
New York City, New York 10005
Tel: (646) 308-1221
*Counsel for Plaintiffs*

i

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Plaintiffs Reed Energy LLC and Reed Energy Exploration, Inc. in support of their motion for leave to amend the complaint in this action (the "Complaint") for purposes of naming the citizenship of the parties in this action. A copy of the proposed amended complaint ("the Amended Complaint") is attached hereto as Exhibit A.

The Court in an order dated September 30, 2013, *sua sponte* dismissed Plaintiffs' complaint for lack of subject matter jurisdiction in order to identify the members of the limited liability company and alleging its citizenship.

In order to maintain this Court's subject matter jurisdiction, Plaintiffs seek to amend their Complaint to identify the members and allege the citizenship of the limited liability companies in this action. Specifically, by this motion, Plaintiffs seek to leave to amend its Complaint to show Defendants are all citizens of Oklahoma, and that no Plaintiffs or any of its members are citizens of Oklahoma. Therefore, there is complete diversity as required by 28 U.S.C. 1332(a), meaning this Court has subject matter jurisdiction over this action.

## ARGUMENT

### The Court Should Grant Plaintiffs' Motion for Leave to Amend the Complaint to Show There is Complete Diversity

Fed. R. Civ. P. 15(a) provides that a party may amend the pleading by obtaining leave of the court or upon written consent of the adverse party and leave shall be freely given when justice so requires. Although leave to amend a complaint is addressed to the sound discretion of the court, "[a] liberal pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)." 3 Moore's, Federal Practice § 15.14[1] (2001).

Plaintiffs seek leave to file the amended complaint attached hereto as Exhibit A.  This Amended Complaint alleges the members and citizenship of the limited liability companies in this action.

*Citizenship of Plaintiffs*

The Plaintiffs in this action are Reed Energy LLC and Reed Energy Exploration, Inc.

**Reed Energy Exploration Inc.** is a Delaware limited liability company with its principal place of business in New York.

The members of **Reed Energy LLC** are Jason Henthorne, AMF Productions LLC, Metropolitan EIH13 LP, and Metropolitan Equity Partners LLC.

**Jason Henthorne** is a resident of Florida.

**AMF Productions LLC** ("AMF") is formed in Wyoming.  Upon information and belief, Plaintiffs believe that the members of AMF are residents of Wyoming.[1]

The members of **Metropolitan EIH13 LP** are as follows:

1. SGM Holdings, LLC, a citizen of Michigan

2. Addison Holdings LLC, a citizen of Ohio

3. Adrian Blumfield, a citizen of Colorado

4. Amit Shah, Indiana

5. Appalachian Capital LLC, a citizen of Connecticut

---

[1] In an action *entitled SGM Holdings LLC et al. v. Lisiak*, 13CV 5224 AKH ("Complaint"), pending before this same Court and currently subject to a Motion to Dismiss for lack of jurisdiction, it is alleged in the complaint by those Plaintiffs that the members of AMF are Oklahoma residents; see Complaint ¶ 16, although they are not themselves the members of AMF.  Accordingly, Plaintiffs do not have confirmation of the citizenship of AMF's members, although we do know that the entity is a Wyoming entity; and as there was complete diversity in the over 100 members, out of abundant caution, Plaintiffs filed in United States District Court.  If in fact Defendants file a response to this Motion or the Complaint identifying the members of AMF as Oklahoma citizens then this Action is properly brought in State Court.

6.    Arthur Lutzke, a citizen of New York

7.    Robert O'Leary, a citizen of New York

8.    Ceceile Chasser Rev. RE Trust, a citizen of Florida

9.    Charlene C. Berardino, a citizen of Connecticut

10.    Clay Lebhar, a citizen of Florida

11.    Comfort Enterprises CA LLC, a citizen of New York

12.    Context Direct II, LP, a citizen of Pennsylvania

13.    Dana Comfort, a citizen of New York

14.    David Comfort, a citizen of New York

15.    David Willey, a citizen of Virginia

16.    Demetris Papademetriou, a citizen of New York

17.    Denis Harte, a citizen of Pennsylvania

18.    Diego Reyes, a citizen of Connecticut

19.    DNV Investment Partnership, a citizen of Tennessee

20.    Edward Bloomberg, a citizen of Utah

21.    Ellen Langer, a citizen of Massachusetts

22.    Entrust IRA Administration, a citizen of Illinois

23.    Entrust Tennessee Inc. FBO Menard, D. IRA, a citizen of Alabama

24.    Eric S Von Stroh, a citizen of New York

25.    Evan Middleton, a citizen of New York

26.    Fred Ganning, a citizen of New Jersey

27.    Gordon and Hoss Family Investments LLC, a citizen of New York

28.    Gregg Freedman, a citizen of New York

29.  Gudrun Zoeller, a citizen of Florida

30.  Hal Mintz, a citizen of New Jersey

31.  Henry Trust Company, Ltd., a citizen of Florida

32.  Ilex Investments LP, a citizen of New York

33.  IRA Services FBO Crawford, G. , a citizen of California

34.  IRA Services FBO Duffy, R., a citizen of California

35.  IRA Services FBO Solari, J., a citizen of California

36.  Jason F Henthorne, a citizen of Florida

37.  Jennifer Chasser, a citizen of California

38.  Jennifer Quasha-Deinard, a citizen of Connecticut

39.  Jodi Alexander-Smith, a citizen of Florida

40.  John Damico, a citizen of Florida

41.  Joint Rev. Trust of Warren & Penny Weiner, a citizen of
     Pennsylvania

42.  Ken Grinspun, a citizen of Tennessee

43.  Ken Lisiak, a citizen of Massachusetts

44.  Kenny Feng, citizenship currently unknown

45.  Kingswood Partners LLC, a citizen of Connecticut

46.  KJH Holdings Co., Inc., a citizen of Ohio

47.  Korn 99, LLC, a citizen of Delaware

48.  Kurt Thoss, a citizen of Florida

49.  Leslie Alexander, a citizen of Florida

50.  Marcus Childress, a citizen of  New York

51. Mark Haines, a citizen of Connecticut

52. Mark Hopkinson, a citizen of New York

53. Maurice Mark Castellano, a citizen of Florida

54. Metropolitan EIH14, LP, a citizen of New York

55. Metropolitan Equity Partners, LLC, a citizen of New York

56. Michael Doniger, a citizen of New York

57. MSSB FBO A. Pollack, a citizen of New York

58. Nicholas Walters, a citizen of New York

59. Osterjung LLC, a citizen of New Jersey

60. OWC 12/23/67 Trust FBO Samuel M.W. Caspersen, a citizen of
    Florida

61. Paul Harte, a citizen of New Jersey

62. Peet Family Investments, LLC, a citizen of New York

63. Pelagic Capital Advisors, LLC, a citizen of New York

64. Peter Harding, a citizen of Louisiana

65. Peter Kearns, a citizen of New Jersey

66. Peter Sterling, a citizen of New York

67. Rafael Escanez, a citizen of Barcelona, Spain

68. Rebekah Woo, a citizen of New York

69. Rev. Trust Agmt. of W. Farnsworth, Jr. , a citizen of Florida

70. Richard Lewis Feldman Revocable Trust 11/16/12, a citizen of
    New York

71. Richard Zoeller, a citizen of New York

72.   Robert Grundstein, a citizen of New Jersey

73.   Rodrigo Rodriguez, a citizen of London, UK

74.   Rosenman Family LLC, a citizen of New York

75.   Ross Berman, a citizen of New York

76.   Ryan Hedrick, a citizen of New York

77.   S. Eugene Mathis, Jr., a citizen of Tennessee

78.   Seamus Lamb, a citizen of New York

79.   Simplex Corp., a citizen of New Jersey

80.   SMWC, Inc., a citizen of Florida

81.   Stephen Edelson, a citizen of New York

82.   Steven Di Fiore, a citizen of New York

83.   Super G, LLC, a citizen of California

84.   The Highlander Fund, LP, a citizen of New York

85.   The Janice Ganning Family 2012 IRR Trust, a citizen of New Jersey

86.   Thomas Labenz, a citizen of Pennsylvania

87.   W. Robert Dahl, a citizen of Connecticut

88.   Wakerly Family Foundation, a citizen of California

89.   Wakerly Trust Agmt, a citizen of Illinois

90.   Wakerly Trust Agreement DTD 6/96, a citizen of Illinois

91.   Yleana Investments LLC, a citizen of New York

The members of **Metropolitan Equity Partners LLC** are as follows:

1.   Paul Lisiak, a citizen of New York

2.  Adrian Blumfield, a citizen of Colorado

3.  DCB Holdings LLC, a citizen of New York

4.  Kenneth Lisiak, a citizen of Massachusetts

5.  Janice Lisiak, a citizen of Massachusetts

6.  Hal Mintz, a citizen of New Jersey

7.  Seth Morris, a citizen of New York

8.  The Wakerly Trust, a citizen of Illinois

9.  Neoko Capital, a citizen of SL, Spain

10. Andrew Rudenstein, a citizen of California

*Citizenship of Defendants*

The Defendants in this action are Regent Private Capital LLC, Regent Private Capital II LLC, Charles Stephenson, and Lawrence Field.

**Regent Private Capital LLC** is an Oklahoma limited liability company.  Charles Stephenson is the founder and managing director of Regent Private Capital LLC.  Lawrence Field is the co-founder and managing director of Regent Private Capital LLC.  Upon information and belief, all members of Regent Private Capital LLC are residents of Oklahoma

**Regent Private Capital II LLC** is an Oklahoma limited liability company.  Charles Stephenson is the founder and managing director of Regent Private Capital II LLC.  Lawrence Field is the co-founder and managing director of Regent Private Capital II LLC.  Upon information and belief, all members of Regent Private Capital II LLC are residents of Oklahoma.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully requests that this Court grant Plaintiffs motion for leave to amend the Complaint pursuant to Rule 15, as there is complete

diversity as required by 28 USC 1332 in order for this Court to have subject matter jurisdiction

over this action.

New York, New York
Dated:  September 30, 2013                      WILSON HARVEY BROWNDORF LLP

                                               By: _____
                                                       Matthew C. Browndorf
                                                       Rudyard W. Ceres

                                               77 Water Street, 7th floor
                                               New York, New York 10005
                                               Telephone (646) 308-1221
                                               Facsimile (646) 513-3205

                                               *Attorneys for Plaintiffs Reed Energy, LLC and Reed
                                               Energy Exploration, Inc.*

EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

| | |
|---|---|
| REED ENERGY, LLC and REED<br>ENERGY EXPLORATION, INC., | :<br>:   **JURY TRIAL DEMANDED**<br>: |
| Plaintiffs, | :<br>: |
| | :   Case No.:  1:13-cv-06656-AKH<br>: |
| - against - | :<br>: |
| REGENT PRIVATE CAPITAL LLC,<br>REGENT PRIVATE CAPITAL II, LLC,<br>CHARLES STEPHENSON and<br>LAWRENCE FIELD, | :   **<u>AMENDED COMPLAINT</u>**<br>:<br>:<br>: |
| | :<br>: |
| Defendants. | : |

--------------------------------------------------------------------------x

Plaintiffs, Reed Energy, LLC and Reed Energy Exploration, Inc., by and through their counsel, Wilson Harvey Browndorf LLP, as and for their complaint against defendants Regent Private Capital, LLC, Regent Private Capital II, LLC, Charles Stephenson and Lawrence Field, respectfully allege as follows:

## THE PARTIES

1.      Plaintiff Reed Energy, LLC ("Reed") is a Delaware Limited Liability Company with its principal place of business at c/o Metropolitan Equity Partners, LLC, 70 East 55th Street, 15th Floor, New York, New York 10022.

2.      The members of Reed Energy LLC are Jason Henthorne, AMF Productions LLC, Metropolitan EIH13 LP, and Metropolitan Equity Partners LLC.

3.      Jason Henthorne is a resident of Florida.

4.      AMF Productions LLC ("AMF") is formed in Wyoming. Upon information and belief, all of the members of AMF are residents of Wyoming.

5.      The members of Metropolitan EIH13 LP are as follows:

a.      SGM Holdings, LLC, a citizen of Michigan

b.      Addison Holdings LLC, a citizen of Ohio

c.      Adrian Blumfield, a citizen of Colorado

d.      Amit Shah, Indiana

e.      Appalachian Capital LLC, a citizen of Connecticut

f.      Arthur Lutzke, a citizen of New York

g.      Bob O'Leary, citizenship currently unknown

h.      Ceceile Chasser Rev. RE Trust, a citizen of Florida

i.      Charlene C. Berardino, a citizen of Connecticut

j.      Clay Lebhar, a citizen of Florida

k.   Comfort Enterprises CA LLC, a citizen of New York

l.   Context Direct II, LP, a citizen of Pennsylvania

m.   Dana Comfort, a citizen of New York

n.   David Comfort, a citizen of New York

o.   David Willey, a citizen of Virginia

p.   Demetris Papademetriou, a citizen of New York

q.   Denis Harte, a citizen of Pennsylvania

r.   Diego Reyes, a citizen of Connecticut

s.   DNV Investment Partnership, a citizen of Tennessee

t.   Edward Bloomberg, a citizen of Utah

u.   Ellen Langer, a citizen of Massachusetts

v.   Entrust IRA Administration, a citizen of Illinois

w.   Entrust Tennessee Inc. FBO Menard, D. IRA, a citizen of Alabama

x.   Eric S Von Stroh, a citizen of New York

y.   Evan Middleton, a citizen of New York

z.   Fred Ganning, a citizen of New Jersey

aa.   Gordon and Hoss Family Investments LLC, a citizen of New York

bb.   Gregg Freedman, a citizen of New York

cc.   Gudrun Zoeller, a citizen of Florida

dd.   Hal Mintz, a citizen of New Jersey

ee.   Henry Trust Company, Ltd., a citizen of Florida

ff.   Ilex Investments LP, a citizen of New York

gg.   IRA Services FBO Crawford, G. , a citizen of California

2

hh.   IRA Services FBO Duffy, R., a citizen of California

ii.    IRA Services FBO Solari, J., a citizen of California

jj.    Jason F Henthorne, a citizen of Florida

kk.   Jennifer Chasser, a citizen of California

ll.    Jennifer Quasha-Deinard, a citizen of Connecticut

mm.  Jodi Alexander-Smith, a citizen of Florida

nn.   John Damico, a citizen of Florida

oo.   Joint Rev. Trust of Warren & Penny Weiner, a citizen of

       Pennsylvania

pp.   Ken Grinspun, a citizen of Tennessee

qq.   Ken Lisiak, a citizen of Massachusetts

rr.    Kenny Feng, citizenship currently unknown

ss.    Kingswood Partners LLC, a citizen of Connecticut

tt.    KJH Holdings Co., Inc., a citizen of Ohio

uu.   Korn 99, LLC, a citizen of Delaware

vv.   Kurt Thoss, a citizen of Florida

ww.  Leslie Alexander, a citizen of Florida

xx.   Marcus Childress, a citizen of  New York

yy.   Mark Haines, a citizen of Connecticut

zz.   Mark Hopkinson, a citizen of New York

aaa.  Maurice Mark Castellano, a citizen of Florida

bbb.  Metropolitan EIH14, LP, a citizen of New York

ccc.  Metropolitan Equity Partners, LLC, a citizen of New York

ddd.  Michael Doniger, a citizen of New York

eee.  MSSB FBO A. Pollack, a citizen of New York

fff.  Nicholas Walters, a citizen of New York

ggg.  Osterjung LLC, a citizen of New Jersey

hhh.  OWC 12/23/67 Trust FBO Samuel M.W. Caspersen, a citizen of Florida

iii.  Paul Harte, a citizen of New Jersey

jjj.  Peet Family Investments, LLC, a citizen of New York

kkk.  Pelagic Capital Advisors, LLC, a citizen of New York

lll.  Peter Harding, a citizen of Louisiana

mmm.    Peter Kearns, a citizen of New Jersey

nnn.  Peter Sterling, a citizen of New York

ooo.  Rafael Escanez, a citizen of Barcelona, Spain

ppp.  Rebekah Woo, a citizen of New York

qqq.  Rev. Trust Agmt. of W. Farnsworth, Jr. , a citizen of Florida

rrr.  Richard Lewis Feldman Revocable Trust 11/16/12, a citizen of New York

sss.  Richard Zoeller, a citizen of New York

ttt.  Robert Grundstein, a citizen of New Jersey

uuu.  Rodrigo Rodriguez, a citizen of London, UK

vvv.  Rosenman Family LLC, a citizen of New York

www.    Ross Berman, a citizen of New York

xxx.  Ryan Hedrick, a citizen of New York

yyy.  S. Eugene Mathis, Jr., a citizen of Tennessee

zzz.  Seamus Lamb, a citizen of New York

aaaa. Simplex Corp., a citizen of New Jersey

bbbb.    SMWC, Inc., a citizen of Florida

cccc. Stephen Edelson, a citizen of New York

dddd.    Steven Di Fiore, a citizen of New York

eeee. Super G, LLC, a citizen of California

ffff.  The Highlander Fund, LP, a citizen of New York

gggg.    The Janice Ganning Family 2012 IRR Trust, a citizen of New Jersey

hhhh.    Thomas Labenz, a citizen of Pennsylvania

iiii.  W. Robert Dahl, a citizen of Connecticut

jjjj.  Wakerly Family Foundation, a citizen of California

kkkk.    Wakerly Trust Agmt, a citizen of Illinois

llll.  Wakerly Trust Agreement DTD 6/96, a citizen of Illinois

mmmm.    Yleana Investments LLC, a citizen of New York

6.    The members of Metropolitan Equity Partners LLC are as follows:

a.  Paul Lisiak, a citizen of New York

b.  Adrian Blumfield, a citizen of Colorado

c.  DCB Holdings LLC, a citizen of New York

d.  Kenneth Lisiak, a citizen of Massachusetts

e.  Janice Lisiak, a citizen of Massachusetts

f.  Hal Mintz, a citizen of New Jersey

g.  Seth Morris, a citizen of New York

5

    h.  The Wakerly Trust, a citizen of Illinois

    i.  Neoko Capital, a citizen of SL, Spain

    j.  Andrew Rudenstein, a citizen of California

7.     Plaintiff Reed Energy Exploration, Inc. is a Delaware corporation and a majority-owned subsidiary of Reed.  Prior to 2013, the name of Reed Energy Exploration, Inc. was NFI Acquisition Company, Inc. ("NFI").  (Reed Energy Exploration, Inc. will be referred to below as "NFI" and, together with Reed, as the "Plaintiffs.")  NFI's principal place of business is also c/o Metropolitan Equity Partners, LLC, 70 East 55th Street, 15th Floor, New York, New York 10022.

8.     Defendant Regent Private Capital LLC ("Regent") is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105. Upon information and belief, all members of Regent Private Capital LLC are residents of Oklahoma.

9.     Defendant Regent Private Capital II LLC ("Regent II") is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105 and is the successor in interest to Regent. Upon information and belief, all members of Regent Private Capital LLC are residents of Oklahoma.

10.    Defendant Charles Stephenson ("Stephenson") is the founder and a managing director of Regent and the founder and Chairman of the Board of Premier and, upon information and belief, is a resident of Oklahoma.

11.    Defendant Lawrence Field ("Field") is the co-founder and a managing director of Regent and, upon information and belief, is a resident of Oklahoma.

### JURISDICTION

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(a) because Plaintiffs' claims exceed $75,000 and the residences of Plaintiffs are diverse from Defendants.

## FACTUAL BACKGROUND

**A.      The Defendants**

13.     Regent describes itself on its web site as "a private family investment fund," with "a diversified portfolio of investments in the Oil and Gas" sector and other sectors, also.

14.     In fact, Regent refers to itself several times on its web site as a "family office" and a "family … fund." The family being referenced is the Stephenson family of Tulsa, Oklahoma.

15.     Charles Stephenson is described as the founder and a managing director of Regent on the Regent web site. Field is Stephenson's son-in-law. According to the Regent web site, Stephenson "oversees [Regent's] management and investment activities" and Field "is actively involved in the firm's investment decisions and directly supports the growth of member portfolio companies."

16.     On information and belief, Stephenson and his daughter (who is Field's wife) own all the interests in Regent.

17.     On information and belief, Cynthia Field is an officer of Regent.

18.     In a public SEC filing, Regent identified itself as liquidating and dissolving and identified Regent II as a successor in interest:

> Regent Private Capital, LLC, formerly the principal stockholder of the Company ("Regent") and (ii) Regent Private Capital II, LLC ("Regent II"), a company whose sole member is Charles C. Stephenson, Jr., one of the Company's principal stockholders. Mr. Stephenson became a stockholder of the Company upon the transfer of a portion of the shares of the Company's common stock, from Regent to Mr. Stephenson, effective as of December 31, 2012, upon the dissolution and liquidation of Regent. Additionally, Lawrence Field, the Company's sole officer and director, was the managing member of Regent and is currently the managing member of Regent II. All of Regent's rights in

7

prior loans provided by Regent and certain other stockholders of the Company, from December 29, 2009 to December 31, 2012, were assigned to Mr. Stephenson and Cynthia Field, who was assigned Regent's remaining shares of common stock, is the Secretary of Regent II, and is Lawrence Field's wife.

Blink Couture Inc., Form 10-Q for the period ending in January 31, 2013(filed March 18, 2013), from SEC.gov website, http://www.sec.gov/Archives/edgar/data/1378125/000135 448813001275/blku_10q.htm (accessed September 18, 2013).

19.     Stephenson has had a long and successful career in the oil and gas industry.  From 1973 to 1982, he was an owner and the President of Andover Oil Company.  In 1983, he founded Vintage Petroleum, Inc., which he took public in 1990 and sold to Occidental Petroleum in 2006.

20.     After selling Vintage Petroleum, Inc. for $4.3 billion, Stephenson founded Premier Natural Resources ("Premier").  Stephenson is the Chairman of the Board of Premier. On information and belief, Stephenson owns all or a majority of the interests in Premier.

21.     Premier is a private oil and gas exploration and production company, which operates oil and gas wells in Louisiana, Mississippi, and Texas.

22.     Premier is a partner with Kohlberg Kravis Roberts & Co. L.P. ("KKR") to pursue investments in North American oil and gas properties. Through its partnership with KKR, Premier describes its mission as follows:  "to invest capital in producing North American assets with significant upside potential and develop new reserves of domestic energy."

23.     Regent and Premier share office space (including conference rooms) and a telephone system and Field and Stephenson work out of a shared Executive Suite.  Telephone calls from Regent's main telephone number are identified on "caller ID" as coming from Premier.

**B.     <u>Plaintiffs</u>**

24.     Reed and NFI were formed at the direction of Metropolitan Equity Partners, LLC ("Metropolitan") for the purpose of investing in the oil and gas drilling rights and operations described below.

25.     Metropolitan is a New York City-based investment manager which provides outsourced private equity services to high net worth investors on a call-fund basis. Metropolitan's call-funds are structured as single purpose limited partnerships which allow investors to invest on a deal-by-deal basis.

26.     Metropolitan EIH13, L.P. ("Met13"), a Delaware limited partnership formed in 2011, is a Metropolitan call-fund which was established to allow investors to invest, through the purchase of limited partnership interests in Met13, in the oil and gas drilling rights and operations more fully described below.  An affiliate of Metropolitan serves as the management company of Met13.

27.     Reed is a majority-owned subsidiary of Met13 and NFI is a majority-owned subsidiary of Reed.

28.     Met13 solicited and received funds from investors which it then used, in part, to make a secured first lien debt investment and purchase an equity interest in Reed, which is the entity that acquired some of the oil and gas drilling rights and operations described below.  Other oil and gas drilling rights and operations described below were acquired by Reed's majority-owned subsidiary, NFI.

C.      **Regent Presents to Metropolitan The Oil and Gas Investment Opportunity**

29.     In 2009, SGM Holdings, LLC ("SGM") (or a predecessor entity) obtained an option in 171 shallow gas wells (the "Shallow Operation") in Washington, Meigs, and Galia Counties in Ohio from Bobby Anderson and his wife, Marjorie Anderson (the "Andersons").

30.     However, after two years of failed attempts, SGM (and its purported predecessor) were never able to raise the capital necessary to exercise the option and develop and work the Shallow Operation.

31.     In 2011, SGM and its president, Richard Featherly, approached Regent for the purpose of obtaining the necessary capital.

32.     Instead of investing its own capital, Regent, in May 2011, suggested to Metropolitan that it consider the opportunity to invest in the Shallow Operation.

33.     Regent was familiar with Metropolitan because of a prior transaction in which both Regent and Metropolitan were involved.   After this prior transaction, Field approached Metropolitan suggesting that Regent and Metropolitan find ways to work together in the future.

34.     Field described the opportunity as an opportunity to acquire shallow gas wells that had not been adequately maintained and worked due to the death of the Andersons' son 10 – 15 years earlier.   Regent further represented that, with a strategic investment of new capital in the Shallow Operation, it could produce $10 – 20 million of EBITDA per year, according to diligence and calculations made by Regent by utilizing the technical resources, employees and expertise of Premier.

35.     Regent does not employ any oil and gas experts, petroleum engineers or geologists, but represented that it was accessing these resources from Premier, which Field represented was controlled by Stephenson and him, just as Regent was controlled by Stephenson and him.

36.     Field told Metropolitan that, separately, an investor could also acquire rights to the oil and gas in the Utica Shale, both below the Shallow Operation and elsewhere (the "Deep Rights"), and that the Deep Rights could be resold almost immediately, through Regent, utilizing its and Premier's relationships and execution capabilities, for a significant profit over and above the initial investment.

37. Field knew that, although Metropolitan is an experienced equity investor, it did not have experience with or expertise in oil and gas assets. Field told Metropolitan that if it acquired the Shallow Operation, Regent, through Premier, would provide the experience and expertise in oil and gas to deliver above average returns to Metropolitan's investors.

38. Specifically, Field said that Regent would be able to (a) attract and provide formal oversight of top-tier service providers who could maximize cash flow from the Shallow Operation; and (b) attract top-tier candidates for a quick sale of the Deep Rights. Field spoke frequently of the many relationships Stephenson and he had with high level employees at major oil and gas companies and said he was personally acquainted with potential buyers of the Deep Rights who would have an interest in their acquisition.

39. Field portrayed himself and Regent as uniquely able to bring this promised package together because he was able to bring the significant experience, expertise, and relationships throughout the oil and gas industry of Stephenson and Premier to the deal. Field routinely spoke and wrote emails utilizing "we" and "our" in contexts where it was plain that he was referring not just to Regent, but also to Stephenson and Premier. These representations were made both to Metropolitan as well as directly to prospective investors in Met13 in meetings and phone calls.

40. Field repeatedly spoke of the success of Stephenson and Premier, describing Premier as part and parcel of the Regent team and as a separate entity in name only. These representations were made both to Metropolitan as well as directly to prospective investors in Met13 in meetings and phone calls.

41. Field explained that Regent, Premier, Stephenson, and he were precluded from investing in the opportunity presented by SGM because of the partnership between Premier and

KKR or they would have invested in the combination of the Shallow Operation and Deep Rights themselves.

42.     Metropolitan reasonably believed that Field had the authority to speak not only on behalf of Regent, but also on behalf of Stephenson, due to Stephenson's position at Regent as the person responsible for overseeing the management and investment activities of Regent and as being "actively involved" in the company's investment decisions.  Metropolitan also relied on Field's position as a "co-manager" of Regent with Stephenson.  Field also spoke of Stephenson as his "partner" in all activities.  Metropolitan further relied on Field's statements that he could deliver Stephenson's expertise, experience and relationships in support of the investment he was urging Metropolitan to make.

43.     Metropolitan also reasonably believed that Field had the authority to speak on behalf of Premier, relying on Field's statements to that effect and his numerous representations that he attended meetings with KKR and other entities associated with Premier, as well as the shared offices, telephone system and ownership of Regent and Premier, and that Stephenson is the person ultimately in charge of both companies.  Metropolitan also relied on the fact that Field demonstrated significant personal knowledge of Premier activities, disclosing to Metropolitan confidential details of future Premier acquisitions which later proved accurate according to publically announced transaction details.

44.     Field intentionally misled both Metropolitan and Met13 investors to believe that Stephenson and Premier's expertise, experience, and relationships in the oil and gas industry had been used to complete the diligence on the opportunity brought to Metropolitan and would be available to Metropolitan and its investors if they invested in the opportunity brought to it by Regent.

45.     Given its lack of experience with oil and gas, Metropolitan would not have even considered the opportunity brought to it by Regent absent the repeated assurances of Field that the same individual (Stephenson) and entity (Premier) trusted by KKR to partner with it on its oil and gas investments would also be partnering with Metropolitan on its first oil and gas venture.

46.     Field's message to Metropolitan was that all that was required to have a successful Shallow Operation was the capital, to be raised by Metropolitan, and the experience, expertise, resources, and assistance of Regent and Premier.  Further, Field indicated that it would offer all of the oil and gas knowledge necessary to sell Met13 securities directly to potential Met13 investors.

47.     With regard to the Deep Rights, Field's message was that all that was required for a successful investment was the pre-qualified buyers with which Regent, Premier, Field, and Stephenson already had existing relationships, and, which Field represented, had probable interest in the Deep Rights as he purported the Deep Rights to be comparable to other acreage in the Utica Shale which was transacting at materially higher prices.  According to Field, the sale of the Deep Rights could easily be achieved with a personal call from Field or Stephenson to a handful of notable oil and gas exploration and production companies who knew them well.

**D.      Regent Fraudulently Edits the Bayswater Diligence Report**

41.     In June 2011, Regent arranged for Metropolitan to tour the Ohio property of the Andersons in the company of Bayswater Exploration and Production ("Bayswater").

42.     Regent recommended that Bayswater be the operator to manage the development of the Shallow Operation and represented that Bayswater was willing to participate in the project.

43.     Given Bayswater's stature and acknowledged expertise in the oil and gas industry, its willingness to assume the management of the Shallow Operation was a major selling point for the deal, in Metropolitan's opinion.

44.     After the tour and, on information and belief, other diligence, Bayswater elected not to participate in the project.

45.     Field knew that Bayswater walked away from the project because of its doubts about the project, but told Metropolitan that Bayswater walked away because Metropolitan's cost of capital was too high.

46.     Field also told Metropolitan that Bayswater wanted to do the project itself with its own financial resources, without Metropolitan, but that he "protected" Metropolitan and saved the deal for it.

47.     In fact, based on its tour of the Andersons' property, Bayswater had written a diligence memorandum reporting not only the positives, but also the significant negatives it saw in the deal.

48.     On September 11, 2011, Field shared the Bayswater memorandum with Metropolitan but only after intentionally removing all negative commentary from it, including significant operational issues requiring correction, as well as other information which highlighted the complexity of the operation and the true ability to extract value from it, thereby intentionally misleading Metropolitan not only about Bayswater's reasons for walking away from the project, but also about the likelihood that the investment would be profitable.

49.     Metropolitan did not receive the full Bayswater memorandum until February, 2013, when SGM provided Metropolitan with a substantial amount of its prior correspondence

with Regent. Metropolitan discovered the unredacted Bayswater memorandum within that correspondence.

50. The omitted information in the full Bayswater memorandum included:

- Issues relating to "casing leaks" on every wellbore in the deal;

- Quantification of abandonment costs for unproductive wells;

- The lack of geologic information, mapping, cash flow information and identification of active vs. inactive wells;

- A "tremendous" lack of technical information, such that the "upside cannot be de-risked through study/technical work"; and

- Data indicating that current cash flow from the assets did not justify significant asset value, and that the "existing deal structure… doesn't fit the asset and opportunity."

51. Field also removed a roadmap to further diligence that would be required in the event that Bayswater continued with the project.

52. Metropolitan would not have moved forward with the investment proposed by Regent and Field if it had had the complete Bayswater memorandum to consider, as Field obviously knew when he intentionally edited the report to remove all negative information.

53. Field now claims that he doctored the Bayswater memorandum in response to a request from Metropolitan for a "headline summary" of the memorandum. However, a comparison of the full and edited memoranda makes plain that it was only the negative findings in the memorandum that Field omitted in what he is now calling the "headline summary."

**E.** **The Proposed Deal Comes Together**

54. After Bayswater declined to participate, the project stalled for several months while Regent searched for a new operator. Then, in or around October 2011, SGM suggested Larry Wise for the position and Field approved his retention, representing that Wise was very knowledgeable, skilled and experienced in oil and gas.

55.     In the meantime, Chesapeake Energy Corporation ("Chesapeake"), the second largest gas producer in the United States, entered into a substantial deal with a joint venture partner in the Utica Shale, seemingly further enhancing what had already been portrayed by Regent as a high quality investment opportunity and jump-starting the project.

56.     Field portrayed the acreage acquired by the Chesapeake joint venture at $15,000/acre as comparable to the acreage he was proposing Metropolitan acquire at a substantially lower price.

57.     In December 2011, one of the Met13 investors commissioned a desktop appraisal report by JT Boyd ("BOYD") for use by Metropolitan and Reed.  BOYD did not conduct a site visit, instead utilized diligence information sent by Regent and SGM, as well as generally available market information from Ohio Department of Natural Resources.  The report did not diligence or opine on the geology but assumed consistencies between Washington County and northern counties with regards to production decline curves, assumptions consistent with the purported diligence by Regent, Premier and Field.   The appraisal concluded "BOYD considers the current status of the Anderson gas holdings to be speculative…." Despite this disclosure, Metropolitan proceeded with the investment based on the expert work of Premier, Regent, and Field who claimed to have greater insight as well as known buyers with even larger inventories of data from which to value Utica Deep Rights.

58.     Metropolitan sought additional input from another industry expert, Jason Henthorne, to provide a "desktop review" of the Deep Rights in the Utica underlying the Shallow Operation.  This cursory review confirmed certain datapoints that Field presented.  More often, these "desktop reviews" generated questions and concerns that Field addressed with ease and

elegance, often referring to the work that was conducted by resources under Regent and Premier's control.

59.     Henthorne reviewed a well log from Lawrence Township in Western Washington County which was encouraging to all participants.  It was later learned that while the well log was in central/western Washington County, it was still not directly comparable to the Deep Rights in the Utica underlying the Shallow Operation as the quality of the shale rock rapidly deteriorates towards the south and the east of Washington County.

60.     Metropolitan's plan was to seek interest from its current investors for a purchase of limited partnership interests in Met13.  Met13 would then use the cash raised in this manner to purchase an equity interest in and lend capital to Reed, its controlled subsidiary.  Reed would use the cash raised from Metropolitan's investors to acquire the Deep Rights for re-sale purposes and for its subsidiary, NFI, to acquire, maintain, and develop the Shallow Operation.

61.     Field conducted telephone calls and met with over a dozen potential investors in Met13 on several occasions in or around November and December 2011 and repeated to them the representations already made to Metropolitan, including representations relating to Premier's relationship with KKR and why it precluded Regent and Premier from doing the deal, as well as representations relating to the quality and potential profitability of the specific proposed investment.

62.     Field also read and approved a Confidential Disclosure Memorandum ("CDM") as well as numerous Power Point presentations, 2-Pagers, and other relevant information disseminated to potential investors that referenced Regent, both by name and as an "industry expert."  For example, the CDM stated:

> As of today, a small portion of the 171 producing wells are not fully functioning and the remainder are producing at sub-standard production levels due to a lack of ongoing investment in required capital expenditures and proper maintenance. While neglected, … diligence in conjunction *with industry experts* suggests that basic improvements may result in a material increase in current production. Further, the diligence suggests that there are unproven but probably unexploited reserves on the acreage.

(Emphasis added.)  The industry experts referred to in this portion of the CDM are Regent and Premier.

63.     Elsewhere in the CDM, Regent is specifically named as Metropolitan's "advisor on energy sector specific decisions." The CDM stated: "Regent will advise the Company prospectively on all energy sector specific decisions, including the sale of the deep drilling rights."

64.     On October 20, 2011, the Andersons and certain companies owned by them entered into a Stock Purchase Agreement with SGM (the "Shallow SPA"). Pursuant to the Shallow SPA, the Andersons and various companies owned by them (the "Anderson Group") agreed to assign 100% of their right, title, and interest in the Shallow Operation, including oil and gas leases, drilled wells, equipment, improvements, permits, and rights of way, to North East Fuel, Inc. and SGM agreed to acquire all outstanding shares of North East Fuel, Inc., for a total purchase price of $8 million, subject to certain adjustments.

65.     On January 4, 2012, SGM assigned the Shallow SPA to NFI.  NFI paid the Andersons $3 million to acquire the Shallow Operation.[1]

66.     On December 28, 2011 (the "Option Assignment"), Clarence W. Mutschelknaus and Raymond McCormick (collectively, "M&M") conveyed to Reed their rights to acquire the Deep Rights, with the agreement and consent of SGM, as well as an Option and Purchase and

---

[1] SGM and Featherly filed suit against NFI and Reed, among other parties, in SGM Holdings LLC v. Paul K. Lisiak, Case No. 13-CV-5224 (SDNY).

18

Sale Agreement between M&M and the Anderson Group (the "Deep Rights Option Agreement"). (The Shallow SPA, Deep Rights Option Agreement and the Option Assignment are referred to collectively herein as the "Mineral Rights Option Agreements.")  Reed paid M&M $2 million for the Deep Rights Option Agreement and subsequently exercised the option, paying the Andersons $4.4 million for the Deep Rights.

67.     Metropolitan committed to raising the capital to acquire and invest in the Shallow Operation and to purchase and hold, pending resale of, the Deep Rights and created Met13, Reed, and NFI as vehicles to carry out this two-pronged investment strategy.  Reed acquired the Deep Rights and NFI acquired the Shallow Operation in reliance on Field's representations that:

(a)     with the investment of a relatively small amount of money to develop its potential, the Shallow Operation would produce consistent and substantial monthly EBIDTA;

(b)     that Wise was a capable operator who could manage the Shallow Operation and deliver the promised result;

(c)     that Regent/Premier would oversee Wise and the development and management of the Shallow Operation and that Regent, utilizing the experience and expertise of Premier, was fully capable of overseeing Wise and the development and management of the Shallow Operation;

(d)     that the Deep Rights in the Utica Shale underlying the Shallow Operation could be obtained for a price substantially below its actual value and almost immediately sold at a higher price to buyers known to Regent/Premier and already waiting in the wings;

(e)     that the value of the Anderson Deep Rights could be maximized if they were actually acquired by Reed and then sold in a "principal to principal" transaction, as opposed to simply "flipping" the Deep Rights Option Agreement between SGM and M&M, hence the need for and value in the money raised by Metropolitan from its investors; and

(f)     that Premier and Regent had already completed the diligence on  the Deep Rights that would support the recommended investment.

19

**F.**     **The Regent Fee Agreement**

68.     On January 4, 2012, Reed and Regent entered into the Regent Fee Agreement, pursuant to which Reed agreed to pay to Regent an aggregate of $1 million (the "Consulting Fee") in connection with services rendered by Regent relating to the transactions contemplated by the Mineral Rights Option Agreements.

69.     The first $500,000 of the Consulting Fee was payable upon the acquisition by Reed of the Anderson Deep Rights, with the first payment due upon the acquisition of 3,000 acres of Anderson Deep Rights and the remainder to be paid pro-rata as Reed acquired the first 7,000 acres of Anderson Deep Rights.

70.     The second $500,000 of the Consulting Fee was to be paid to Regent, on a contingent basis, upon the sale of at least 3,000 acres of the Deep Rights to an unaffiliated third party if Regent was the procuring cause of such sale and such sale occurred at a price equal to or greater than $4,000 an acre.

71.     In conjunction with the Consulting Fee, Reed also sold to Regent a six percent fully-diluted equity interest in Reed for $60 (which was netted against the Consulting Fee).

72.     Regent originally asked for a 15 percent equity stake in Reed and pushed for a 52 percent equity stake for SGM, as justified by what Field represented was the riskless nature of buying "in the money" assets which could be immediately "arbitraged."  (Ultimately, through normal course negotiations, SGM had a 40 percent stake in Reed.)

73.     It was Field who first used of the term "arbitrage," in conjunction with the Deep Rights to signify a quick sale at a substantial premium over the purchase price.  Field used and approved the use of the word in presentations and briefings to investors.  Indeed, the concept of an "arbitrage" was a fundamental theme of all discussions between Field and Metropolitan and Met13 investors.

74.     To date, Reed has paid to Regent $410,917 under the Regent Fee Agreement. (The payment of $410,917 to Regent is actually an overpayment as only 3,653 acres of Anderson Deep Rights were ever acquired, which should have resulted in a payment to Regent of only $260,857.)  Reed has not paid Regent any additional monies for the reasons explained below.

## G.     Reed Discovers Defendants' Fraudulent Misrepresentations and Gross Negligence

75.     Regent's stated strategy for Reed's business model had two primary components. The first component was to acquire up to 9,000 acres of leases in Washington, Athens, and Meigs Counties and almost immediately resell them to a buyer, known to Regent, in a "principal to principal" transaction (Regent's words) without the use of any intermediary.  Second, Reed was to acquire about 6,000 acres of shallow rights from the Anderson Group and perform a "traditional workover of an old field" that would drive both cash flow as well as enterprise value.

76.     With regard to the Deep Rights, Regent said that its and Premier's relationships would not only open doors, but also maximize the price for the acreage.  Field said that he could sell the land in the price range of $3,000 to $5,000 per acre in a time frame of three to six months after the acquisition, promises which both Metropolitan and Regent, through Field, conveyed to Met13 investors.  Had Field been telling the truth, there existed substantial profit in the potential leases.

77.     Regent agreed to (1) deliver diligence services for the acquisition of both the Shallow Operation and Deep Rights; (2) retain all the required expertise and hands-on operators to complete the project and oversee their work in connection with the Shallow Operation; and (3) deliver top-tier buyers in a matter of months for the Deep Rights.

78.     Reed accepted Regent's offer and agreed, in exchange, to enter into the Regent Fee Agreement and to sell Regent a six percent fully-diluted equity interest in Reed for $60.

21

Based on Regent's promises, Reed went forward with the purchase of the Deep Rights and NFI acquired the Shallow Operation.

## 1.     Regent Does Not Do Any Diligence Work

79.     In late 2011, Regent told Metropolitan that Regent had utilized the resources of Premier to validate the assets which were the subject of the Mineral Rights Option Agreements, but that Metropolitan could not access the diligence performed by Regent/Premier to share with its investors as that might be construed as advertising the Premier relationship with KKR, which was forbidden by KKR.

80.     As Field and Regent well knew, Metropolitan did not conduct comprehensive diligence to independently confirm the details of the purported Regent/Premier diligence, as it had no expertise to do so.   Instead, Metropolitan relied upon the representations made and services provided by Regent in exchange for the generous compensation provided under the Regent Fee Agreement.

81.     Instead of sharing with Metropolitan the Regent/Premier diligence which Field represented had been done, Field invoked the Premier/KKR relationship which he represented required confidentiality and offered to, and did, speak directly to Metropolitan's investors, assuring them not only that the requisite due diligence on the assets had been successfully completed, but also that the investment offered enormous potential for financial gain.

82.     Field appeared credible as he routinely pitched his ideas and understanding of the opportunity as not just his own, but the product of Premier's significant expertise, experience, connections, and hard work and from knowledge gained by networking with potential buyers in the course of routine interactions with companies and individuals with which Premier had relationships.

83.     Regent valued its diligence contribution at $2 million in a presentation it made in May 2011.

84.     Reed, subsequent to Met13's investment, discovered that neither Regent nor Premier ever did any diligence work on the assets that were the subject of the Mineral Rights Option Agreements.

85.     With regard to the Shallow Operation, Regent apparently relied on a report prepared by Hefcorp-jon, which was reviewed and updated by Thomas E. Suhy, a petroleum and natural gas engineer, who concluded that the net present value of the natural gas on the Andersons' property was $471 million.

86.     Reed's post-closing, independent investigation of this report with more competent energy-sector advisors establishes that this report is without merit, accuracy, or reality and appears to have been produced on behalf of a seller to bolster valuation.

87.     Mr. Suhy has subsequently committed suicide.

### 2.     The Deep Rights Acreage Turns Out to Be Substantially Less than Regent Represented

88.     Shortly after Reed acquired the option to purchase the Deep Rights and began to market them, it became apparent that Field was unable to bring any potential buyers to the table. In late March 2012, upon growing suspicion that Field wasn't telling the truth, Metropolitan asked Jason Henthorne, a trained geologist who has experience buying and selling oil and gas properties and one of Metropolitan's appointments to the Reed board, to review the situation.

89.     At the time Henthorne began conducting expert geological due diligence on the Deep Rights, Reed had not yet acquired 5,347 of the 9,000 optioned acres.  Based on Henthorne's work, Reed determined that the 3,653 acres that had been acquired could not be profitably developed and, therefore, were substantially less marketable than Regent represented.

Henthorne also determined that 2,500 unacquired acres in southern Washington, Meigs, and Athens Counties could not be profitably developed.  (The remaining 2,847 unacquired acres also could not be profitably developed, but they also did not have clear title and were defective for that reason, too.)

90.     As a result of Henthorne's work, Reed successfully avoided purchasing many acres which Reed would have been unable to re-sell because there is absolutely no hope that they will ever be profitable.

91.     Unfortunately, Reed had already purchased 3,653 acres of Deep Rights when it learned that the Deep Rights which Regent and Field had said could be quickly sold at a premium to buyers they already had in the wings were essentially worthless and illiquid.

92.     In fact, Regent has not produced a single potential buyer for the Deep Rights. The best it has been able to do is to produce a list of energy companies identified through the kind of internet search anyone could do and Regent does not appear to have any meaningful relationship with any of them.

93.     With no assistance from Regent and in an attempt to mitigate further harm, Reed has itself been actively pursuing the sale of the Deep Rights through a reputable publically traded investment bank named Evercore Partners.  Despite disseminating details about the assets to over 300 potential buyers, Reed has not been able to generate any qualified, bona fide interest in the Deep Rights except offers to acquire other owned acreage in North Washington County, Ohio, which Henthorne, not Regent, approved Reed to acquire.  Reed did receive a non-qualified bid for $2,850 per acre from Flatrock Resources who later, on information and belief, did not follow-through on the deal because of a lack of funds.

94.     Most buyers view the Deep Rights geology (and Southern Washington County, in general) to be "unproven," "thinning too rapidly," or "outside of the prospective Utica/Point Pleasant play."

95.     In fact, what Reed has learned is that the acreage touted so enthusiastically by Regent is south of the main Utica Shale play and not considered part of that development.  It is unknown if future technological advances could make the Deep Rights viable, however, not in the foreseeable future.

**3.     The Shallow Operation Wells Are Mostly Abandoned, Nonproductive, or Producing Below Expectations and New Wells Cannot or Should Not Be Drilled**

96.     The Met13 Loan Agreement pursuant to which Reed was lent $17 million[2] to acquire and begin to develop the Shallow Operation, as well as Met13 investor documents, required a development plan and budget for the Shallow Operation to be prepared prior to closing.

97.     Regent delivered a written development plan and budget in March 2011 which Field represented was done in conjunction with Wise.

98.     However, it was not long after Wise took over managing the Shallow Operation that Reed began to suspect that he was not fit to run it.  Wise was unable to produce agreed upon deliverables and failed to keep adequate records.  He also spent unauthorized funds, despite repeated warnings that he was, thereby, in breach of his purported consulting agreement.

99.     Despite prior casual encounters, Reed asked Henthorne to begin to review Wise's work in detail.  Henthorne reported to Reed that he found Wise's work to be deficient and that he lacked local knowledge and a basic understanding of oil and gas implementation.

_____

[2] The initial funding was later increased to $24 million, $27 million and then $38 million, respectively.

100.    Regent, through Field, disagreed with Henthorne, assuring Reed, both before and after Henthorne's review, that Wise had the requisite exploration and production skills and understood the business well.  Wise made multiple diligence trips to Ohio prior to the Anderson acquisition and had adequate access to Anderson from which to conduct further review and report to Regent.

101.    However, Wise was never able to adequately manage the Shallow Operation and had to be terminated on December 3, 2012.  At that point, Henthorne's family-owned oil and gas business, Petro Evaluation Services, LLC ("Petro"), took over control of the Shallow Operation.

102.    Petro also discovered that of the 171 wells that Reed believed it was acquiring, 20 either cannot be found, as it appears they were abandoned decades earlier, or the leases have lapsed and the wells cannot be inspected.

103.    Of the remaining 151, 72 are not producing and Petro has concluded that they are not economically viable as the cost of bringing them back online exceeds any potential return from them.  Another 49 wells are producing in such low quantities that the cost of running them exceeds what their current production yields.

104.    According to the Ohio Department of Natural Resources ("ODNR") regulations, these 141 wells must be plugged.  The cost of plugging these wells will be about $2.5 - $3 million.

105.    The remaining wells are in poor condition, with minimal to no value in the equipment on location.  With only a few exceptions, the production is very poor as most of the wells have either been in production for decades or possibly reworked to the point of exhaustion.

106.    Regent also represented that there were approximately 100 locations where new wells could be drilled within the acreage obtained from the Andersons.  Regent represented that

these new wells were already permitted.  Per Regent's original diligence, the first 40 infield wells were projected to generate over $13 million in EBITDA.  Prior to closing on the Anderson deal, Regent redrafted its initial projections for the drilling of 10 new wells that would produce oil and gas sales of $3.7 million per year and NFI subsequently acquired the properties for $3 million instead of $8 million.

107.    Petro has not been able to identify *any* economical infield drilling opportunities and *no* new wells were permitted at the time Regent acquired the Anderson acreage.

108.    Only one new well, the Robinson #4, has been drilled on the property.  The Robinson #4 was drilled after Regent brought in their recommended geology consultant who predicted that this well could have an initial production of 68-71 barrels of oil a day and average 30 barrels of oil per day for the first year.  However, the consultant was provided with only limited data with which to conduct the analysis as Regent had not produced the diligence on the field that had been expected and promised by Regent.

109.    Petro discovered that Wise had fabricated results for a well, known as the Robinson #4 well, overstating production dramatically.

110.    The Robinson #4 is currently producing .85 barrels of oil per day with a total production to date of less than 200 barrels, an insufficient amount to recoup the cost of drilling the well in any reasonable amount of time.

111.    Petro examined the Robinson #4 and determined that the well should not have been drilled and that a competent operator should have known a well in this location was not economically viable.

112.    Annual production revenue for the Shallow Operation is currently running at less than $400,000.  Although Petro is working to minimize costs, the current best case scenario is for

the business, as it exists today, to break even, not taking into account extraordinary costs relating to plugging lost, abandoned and underperforming wells.

113.    Stephenson has since taken over management of Regent's oversight of this investment from Field and is the representative of Regent dealing with Reed.

**H.    <u>Reed and NFI's Losses Caused by Defendants' Misconduct</u>**

114.    In reliance on the fraudulent misrepresentations and omissions set forth above, Reed and/or NFI expended monies that they otherwise would not have expended, including for the following purposes:

> (a)    acquisition of the option on the Deep Rights to M&M;
>
> (b)    acquisition of the Deep Rights and Shallow Operation;
>
> (c)    fees paid to Regent and to SGM;
>
> (d)    capital investments in the Shallow Operation;
>
> (e)    title, legal, and environmental work; and
>
> (f)    cost of capital.

115.    In addition, Reed and/or NFI will incur costs in the future, to plug the lost, abandoned, and underperforming wells described above.

116.    As a result of Regent, Field, and/or Stephenson's conduct, Reed and/or NFI has lost in excess of $17 million dollars.

## AS AND FOR A FIRST CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT
## (as against all Defendants)

117.     Reed and NFI repeat the averments of Paragraphs 1 through 112 above the same as if set forth at length herein.

118.     Field had authority to speak on behalf of Regent by virtue of his position as a co-managing director and the description of his role and duties on Regent's website, as well as Field's representation that he was Stephenson's "partner."

119.     Field had apparent authority to speak on behalf of Stephenson.

120.     Defendants, therefore, willfully and intentionally made the following material misrepresentations of  fact to Metropolitan and/or Met13 and/or Reed and/or NFI intending that Reed and NFI would act in reliance on the misrepresentations or having reason to expect that Reed and NFI would act in reliance on them:

    (a)     That Regent had sufficient expertise in oil and gas, either itself or through Premier, to be able to determine that the Shallow Operation was capable of earning $10 – 20 million of EBITDA per year;

    (b)     That Regent and Premier had done the diligence required to be able to determine that the Shallow Operation was capable of earning $10 – 20 million of EBITDA per year; This figure was later revised down though Regent never gave any estimations of revised long term EBITDA potential. An interim budget delivered by Regent projected $3.7 million of gross revenue from the first 10 wells drilled;

    (c)     That the Shallow Operation was capable of earning $10 – 20 million of EBITDA per year;

    (d)     That Regent had sufficient expertise in oil and gas, either itself or through Premier, to know that the Deep Rights were worth substantially more than what Reed would have to pay to acquire them;

    (e)     That the Deep Rights were worth substantially more than Reed would have to pay to acquire them, inclusive of all legal/title diligence expenses and fees paid to Regent, SGM and Metropolitan;

29

(f)     That current market prices warranted paying $2 million for an option to acquire "scarce acreage";

(g)     That Regent was capable, either itself or through Premier, of identifying, securing contracts with and providing formal oversight of top tier providers who could manage the Shallow Operation;

(h)     That Regent, either itself or through Premier, intended to provide formal oversight of the management of the Shallow Operation;

(i)     That Regent had relationships, either itself or through Premier, with oil and gas companies which Regent and Premier knew to have an interest in acquiring the Deep Rights;

(j)     That the Deep Rights could be sold for substantially more than what Reed would have to pay for them, including the legal and title expense as well as the cost of capital;

(k)     That Regent was able to provide to Metropolitan, Met13, Reed and NFI the experience and expertise in oil and gas of Premier in connection with the Shallow Operation and the acquisition of the Deep Rights;

(l)     That Bayswater had decided not to manage the Shallow Operation because of Metropolitan's cost of capital and not because of doubts about the viability of the Shallow Operation;

(m)     That Regent, either itself or through Premier, had performed due diligence on the Shallow Operation and/or Deep Rights;

(n)     That Regent, either itself or through Premier, was familiar with Wise and that he was a capable operator of oil and gas assets.

121.     The representations made by Field on behalf of the Defendants were, in fact, false and untrue and misleading, and when said misrepresentations were made, Field knew them to be false and willfully, wantonly and to the detriment of Plaintiffs, recklessly disregarded whether the representations were true or misleading.

122.     In addition to the material misrepresentations set forth in Paragraph 116, Regent and Field also, with the intent to defraud, concealed portions of the Bayswater diligence report that would have revealed problems with the Shallow Operation.

123.   Reed and NFI justifiably relied on the misrepresentations and omissions of Regent and Field set forth in Paragraph 116 and 118.

124.   Reed acquired the Shallow Operation in justifiable reliance on the fact that the Bayswater diligence report had been fully and accurately provided to it.

125.   As a result of Reed and NFI's justifiable reliance on the material misrepresentations knowingly made by Regent and Field, Reed and NFI has suffered damages in an amount to be determined at trial but no less than an amount in excess of $17 million.

126.   In addition, Field, on behalf of Defendants, acted with a high degree of moral turpitude, with recklessness, wanton dishonesty, and actual malice, and with an intent to solely benefit himself and the Defendants, therefore entitling Plaintiffs to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEGLIGENT SUPERVISION
### (as against Stephenson)

127.   Plaintiffs repeat the averments of Paragraphs 1 –122 above the same as if set forth at length herein.

128.   As the individual responsible for overseeing the management of Regent and its investment activities, Stephenson owed third parties who had business dealings with Regent a duty to supervise Field so that Field did not engage in fraud.

129.   On information and belief, Stephenson knew of Field's propensity to over-tout and over-sell investment opportunities.

130.   On information and belief, Stephenson knew or should have known that Regent and Metropolitan had had business dealings in the past and that Regent and Field were pressing the oil and gas opportunity on Metropolitan.

131.   Most of the above-alleged misrepresentations made by Field were made by him on the premises of Regent and Premier and/or utilizing the property of Regent and Premier.

## AS AND FOR A THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
#### (as against Regent)

132.   Plaintiffs repeat the averments of Paragraphs 1 – 127 above the same as if set forth at length herein.

133.   Regent through Field agreed with Metropolitan that, if Metropolitan produced the money by calling capital from its investors to invest in the Shallow Operation and Deep Rights, Regent would provide the following:

(a)   Competent and adequate diligence by individuals with experience and expertise in oil and gas for both the Shallow Operation and Deep Rights;

(b)   Identification and oversight of top-tier service providers and managers for the Shallow Operation who could competently maximize cash flow from the Shallow Operation;

(c)   Identification of entities with whom Regent already had relationships who had an active interest in purchasing the Deep Rights;

(d)   Sale of the Deep Rights;

(e)   Access to the experience and expertise of Premier to assist with the above.

134.   Metropolitan performed.

135.   Regent failed to perform material obligations causing injury to Reed and NFI.

## AS AND FOR A FOURTH CAUSE OF ACTION BREACH OF FIDUCIARY DUTY
### (as against Regent, Field and Stephenson)

136.   Plaintiffs repeat the averments of Paragraphs 1 – 131 above the same as if set forth at length herein.

137.   Regent, Field and Stephenson had superior knowledge of material information about the Shallow Operation and the Deep Rights that was purposefully withheld from

Metropolitan, Met13, Reed and NFI, most notably the omitted material from the Bayswater diligence report, but also, on information and belief, the true nature of the Shallow Operation and Deep Rights.

138.   Metropolitan, Met13, Reed and NFI reposed confidence in Regent, Field and Stephenson and reasonably relied on their superior experience and expertise.

139.   Regent, Field and Stephenson, thereby, exercised control and dominion over Reed and NFI.

WHEREFORE, Plaintiffs respectfully request relief and judgment from the Court as follows:

(a)   awarding compensatory damages in favor of Plaintiffs against all Defendants for all damages sustained by Plaintiffs in an amount to be determined at trial, including interest thereon;

(b)   awarding punitive damages in favor of Plaintiffs against all Defendants for all damages sustained by Plaintiffs as a result of Defendants' fraudulent misrepresentations and concealment in an amount to be determined at trial, including interest thereon;

(c)   awarding Plaintiffs the costs and expenses of this action including, but not limited to, reasonable attorneys', accountants' and experts' fees and costs; and

(d)   awarding Plaintiffs such other and further relief as this Court may deem just and proper.

New York, New York
Dated:  September 30, 2013                    WILSON HARVEY BROWNDORF LLP


                                              By: _____
                                                      Matthew C. Browndorf
                                                      Rudyard W. Ceres

                                              77 Water Street, 7th floor
                                              New York, New York 10005
                                              Telephone (646) 308-1221
                                              Facsimile (646) 513-3205

                                              *Attorneys for plaintiffs Reed Energy, LLC and Reed*
                                              *Energy Exploration, Inc.*